UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ALESA A. CANTLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:13-cv-01296-TWP-MJD |
| | ) | |
| INDIANA UNIVERSITY HEALTH, INC., | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY DENYING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT

This matter is before the Court on Defendant Indiana University Health, Inc.'s ("IU Health") Motion for Summary Judgment (Filing No. 53). Plaintiff Alesa A. Cantley ("Ms. Cantley") filed a charge of retaliation and race and age discrimination against IU Health with the U.S. Equal Employment Opportunity Commission ("EEOC"). A few months later, after being terminated from her employment as a cardiovascular technician, Ms. Cantley initiated this lawsuit. IU Health moves for summary judgment, asserting that Ms. Cantley cannot show a retaliatory reason for IU Health's decision to end her employment. For the following reasons, IU Health's Motion for Summary Judgment is **DENIED**.

## I. BACKGROUND

On February 4, 2013, Ms. Cantley was terminated from her employment as a cardiovascular technician in IU Health's electrocardiography department at IU Health Methodist Hospital. Ms. Cantley, an African American, began working for IU Health in April 2006 and for the first six years of her employment received promotions in position and pay. After working for IU Health for two years, Ms. Cantley applied for and was offered a position as a certified patient care assistant on September 28, 2008. She later applied for and was offered a position as a certified

technician for unit support on April 12, 2009.  A short time thereafter, Ms. Cantley applied for and was offered a position as a unit secretary in June 2009.  In 2010, Anne Riley ("Ms. Riley"), then the heart station night team leader, encouraged Ms. Cantley to apply for a cardiovascular technician position in the electrocardiography department.  With Ms. Riley's encouragement, Ms. Cantley applied for and was offered a position as a cardiovascular technician in August 2010.  Ms. Cantley then started applying for various promotions and positions within the cardiovascular department.

On October 1, 2010, Ms. Cantley performed an electrocardiogram ("EKG") on a patient, and two hours later, a nurse submitted a request for a second EKG on the same patient.  Ms. Cantley assumed that it was a duplicate order and did not perform the second ordered EKG.  Because the EKG order was ignored, the nurse called the team leader, Ms. Riley, to explain that the EKG still needed to be completed.  Ms. Cantley was directed to perform the EKG.  The EKG eventually was performed more than two hours after it had been ordered.  Ms. Riley provided informal counseling to Ms. Cantley regarding the need to timely complete EKGs, to never ignore EKG orders, and to call to confirm the order if there is a question whether it is an unnecessary duplicate.  Ms. Cantley also was counseled that physicians sometimes order several EKGs for a single patient in a short time span (Filing No. 55-5 at 10).

Approximately a week later, on October 11, 2010, Joshua Dobbs ("Mr. Dobbs"), one of Ms. Cantley's supervisors at the time, provided informal counseling to Ms. Cantley, for an incident that had occurred a few nights earlier.  A patient complained that Ms. Cantley had been rude and unprofessional about the nursing staff while she was providing care, which made the patient uncomfortable. Ms. Cantley denied being rude. (Filing No. 55-3 at 26). Regardless, Mr. Dobbs counseled Ms. Cantley to be professional, especially when with patients (Filing No. 55-15 at 29).

On November 22, 2010, Ms. Cantley talked with Ms. Riley about taking time off work during the Christmas holiday.  Ms. Riley explained to her that she already was scheduled to work some days off, and that because of coverage issues, she would not be able to take the additional requested leave.  Ms. Riley claims that Ms. Cantley responded that she would just call in on those days to say that she was not coming to work, and that Ms. Riley explained that this approach could lead to corrective action (Filing No. 55-15 at 32). Ms. Cantley denies that she made the statement about calling in. (Filing No. 55-2 at 28).

On December 10, 2010, Ms. Cantley accidently left her pager in the IV/EKG technician room, and the pager was later found by Ms. Riley with a STAT EKG order on it.  STAT orders were to be completed within fifteen minutes.  Additional orders were also waiting on the pager.  A STAT IV order was left pending for more than two hours.  Another technician completed the STAT EKG but then had to complete her own assignments.  Ms. Cantley was counseled by Ms. Riley on the importance of having her pager and completing her tasks.  On December 21, 2010, Mr. Dobbs issued a written warning corrective action to Ms. Cantley for this incident because it delayed patient care and affected other employees' work (Filing No. 55-5 at 13).  Ms. Cantley appealed the written warning through IU Health's internal appeals process, but the written warning was affirmed.  However, Management agreed to rescind the written warning if Ms. Cantley did not have any other incidents within a six month period (Filing No. 55-6 at 5).  After six months, there were no other incidents and the written warning was rescinded per the agreement.

Ms. Cantley's 2011 employee annual review was generally positive and noted that she was meeting expectations in all areas.  The review specifically noted that Ms. Cantley had been improving in "realizing the importance of doing STAT EKG's in a timely manner," and that

she "usually does EKG and Muse paperwork timely and with few mistakes.  She has improved on checking her Cerner task list and muse EKG order list." (Filing No. 55-16 at 6.)

In late 2011 or early 2012, Ms. Cantley complained to Ms. Riley that IU Health had failed to promote her because of her race and that there was no diversity in leadership within the heart station.  Around this same time, Ms. Cantley complained to James Bowman ("Mr. Bowman"), an interim manager and later a supervisor in the heart station, and Andrea Daniels ("Ms. Daniels"), the executive director of cardiovascular services at IU Health, that there was no diversity in leadership. Specifically, Ms. Cantley questioned why Dawn and Brenda, two African American females, were never offered advancement in the telemetery department. (Filing No. 55-1 at 40-41). After Ms. Cantley complained about the lack of diversity in leadership, Ms. Riley did not speak to her very much. (Filing No. 55-2 at 41).

In April 2012 and May or June 2012, Ms. Cantley applied for positions in telemetry and as a team leader within the heart station, but she was not offered, nor interviewed for, the positions. Then in July 2012, Ms. Cantley complained to Brenda Sisson and Laura Otten ("Ms. Otten") in IU Health's human resources department that she was being subjected to retaliation because she had complained about the lack of diversity in leadership.

On June 5, 2012, Mr. Bowman, Ms. Cantley's new interim manager, received a complaint from a nursing manager that Ms. Cantley had interacted unprofessionally with nurses and a patient. Specifically, the patient nursing manager reported that on June 4, 2012, a patient complained that Ms. Cantley had been rough with him and asked that she not come back in his room. Mr. Bowman interviewed Ms. Cantley on June 11, 2012 and she denied that she was rude. Because he delayed his investigation, Mr. Bowman was not able to interview the patient prior to the patient being

discharged. Mr. Bowman issued documented counseling corrective action to Ms. Cantley on June 28, 2012 (Filing No. 55-7 at 4).

A written warning corrective action was also issued to Ms. Cantley on July 13, 2012, alleging a pattern of unscheduled, unexcused absences that occurred just before pre-approved, scheduled time off.  The incidents described are as follows:

- Alesa requested and was granted off 3/4, 3/5, 3/6, 3/7, 3/8 and 3/9/11 (She called in for an unscheduled absence on 3/3/11).
- Alesa requested and was granted off 8/17, 8/18, 8/19, 8/20/2011 (She called in for an unscheduled absence on 8/15 and 8/16/11)
- Alesa requested and was granted off 6/21, 6/22, 6/23, 6/24, 6/26/12 (She called in for unscheduled absence on 6/18, 6/19 and 6/20/12).

(Filing No. 57-7 at 8). Ms. Cantley appealed the written warning corrective action through IU Health's internal appeals process on July 18, 2012, (Filing No. 55-7 at 9), but the written warning was affirmed by the executive director of the department, Ms. Daniels (Filing No. 55-7 at 13).

On October 19, 2012, Ms. Cantley complained that she was unable to obtain approval to utilize her PTO time while other employees within Ms. Cantley's department who were close to accumulating the limit on PTO time were simply taken off the schedule to ensure they were able to utilize their PTO time. (Filing No. 55-1 at 32-33). Only after raising this issue with Ms. Otten, in IU Health's human resources department, was Ms. Cantley given an opportunity to exercise her earned PTO. *Id.*

On October 22, 2012, Ms. Cantley filed a Charge with the EEOC, alleging that IU Health engaged in race discrimination and also retaliated against her for engaging in protected activity (Filing No. 55-9 at 33).  Ms. Otten received the notice of the EEOC Charge in October 2012.

On November 7, 2012, Ms. Riley received a telephone call from a nurse who requested the record of an EKG that was performed the night before so that the patient could be discharged from the hospital.  The nurse informed Ms. Riley that Ms. Cantley had been rude and abrupt the night

before and that Ms. Cantley had taken the original EKG record from the patient's file and had written on it.  Ms. Riley reviewed the EKG record that Ms. Cantley had delivered to her the night before and realized that it was the original record and that it had been written on.  Ms. Riley delivered the original EKG record to the nurse, but it could not be used because of the writing on it, so she then delivered a clean copy of the record to the nurse for the patient's discharge.  Because of this incident, on November 26, 2012, Ms. Daniels issued a written warning corrective action to Ms. Cantley for unprofessional interactions with the nursing staff and for removing an original medical record from the patient's file and writing on it (Filing No. 55-8 at 2).  This written warning corrective action was affirmed following an internal appeal, which was requested by Ms. Cantley on December 4, 2012 (Filing No. 55-8 at 6).

Ms. Cantley's termination occurred on February 4, 2013.  On January 21, 2013, Michael VanderWier ("Mr. VanderWier"), the heart station night team leader, received a telephone call from a telemetry technician at approximately 11:00 p.m.  He was informed that nursing staff had called about two pending EKG orders, one of which was ordered STAT, which had been ordered at approximately 5:00 p.m.  Mr. VanderWier called the nursing staff and asked that they reorder the EKGs, which they did.  When Mr. VanderWier checked the Cerner task list, the EKG orders were not on the list.  At about this same time, Ms. Cantley was leaving the heart station with an EKG cart.

Soon thereafter, Ms. Cantley brought contact information to Mr. VanderWier of a nurse that wanted to talk with him.  Mr. VanderWier called the nurse who then told Mr. VanderWier that he had placed a STAT EKG order at approximately 5:00 p.m., and the EKG was still pending.  Mr. VanderWier asked the nurse to reorder the EKG.  Mr. VanderWier asked the cardiovascular technicians to complete the EKG orders that were pending.  He then tried to learn why the EKG

6

orders were not completed earlier and why the orders were not appearing on the Cerner task list. Mr. VanderWier initially thought the problem stemmed from technology issues, so he asked IU Health's IT department to investigate the problem.

During the next shift, Mr. VanderWier informed Ms. Riley of the problems that had been experienced with Cerner and the incomplete EKGs. Mr. VanderWier and Ms. Riley searched the computer systems and discovered that the three EKG orders had been placed between 5:00 and 5:30 p.m. and that at approximately 7:20 p.m. Ms. Cantley had documented the orders as "completed." Ms. Cantley added a note "Day shift, assumed done" to the orders (Filing No. 55-17 at 13). When an EKG order is marked as "completed," the order is removed from the cardiovascular technician's task list. Ms. Cantley failed to verify that the EKG orders actually had been performed, which they had not, before marking them as "assumed done" and assuming they were completed. This resulted in a delay in patient care.

Mr. VanderWier and Mr. Bowman met with Ms. Cantley to discuss the three delayed EKG orders. Ms. Cantley explained that when she started her shift the cardiovascular technician from the previous shift had represented that there were no outstanding orders to be completed. She acknowledged that she saw the three EKG orders pending on the Cerner task list. She also acknowledged that she marked the orders as "assumed done" and that she had done so without first verifying that the orders actually had been completed.

Mr. Bowman notified Ms. Daniels, the executive director of cardiovascular services, of the incident. Ms. Daniels interviewed Ms. Cantley, Ms. Riley, Mr. VanderWier, and the nurses who placed the EKG orders. Ms. Daniels verified Ms. Cantley's responsibility for the incident and found that her actions delayed patient care, which is considered negligence under IU Health's policies, which is grounds for termination on the first offense. Thus, Ms. Daniels decided to

terminate Ms. Cantley's employment with IU Health.   Ms. Daniels signed Ms. Cantley's involuntary termination paperwork on February 4, 2013, with a termination date effective that same day (Filing No. 55-9 at 14).  The termination papers noted that the January 21, 2013 incident was the fourth issue within the previous seven months that required corrective action for Ms. Cantley.

Ms. Cantley requested reinstatement and a review of the termination decision via IU Health's internal appeals process (Filing No. 55-9 at 18).  During the appeal, Ms. Cantley admitted that she deleted the three EKG orders without verifying their completion, but she argued that the practice of deleting old EKG orders from the Cerner task list without first verifying that the orders had been completed was a common practice among the cardiovascular technicians.  She also argued that she was being unfairly singled out for discipline (Filing No. 55-9 at 25).  Following a review of documents and completion of interviews, the decision to terminate Ms. Cantley's employment was upheld.  IU Health concluded that the practice of deleting EKG orders without first verifying their completion was not a common practice but rather Ms. Cantley's practice (Filing No. 55-9 at 26).  IU Health also concluded that this practice constituted falsifying patient records, which was considered gross misconduct (Filing No. 55-9 at 28).

Before Ms. Cantley's internal appeal was completed, on February 19, 2013, Ms. Cantley filed an Amended Charge with the EEOC, alleging that IU Health engaged in race and age discrimination and also retaliated against her for engaging in protected activity (Filing No. 55-9 at 29).  Ms. Otten requested and received multiple extensions of time to investigate and respond to the EEOC Charges (Filing No. 61-1 at 2).  Ms. Otten does not dispute that she received notice of the original EEOC Charge in October 2012 and received notice of EEOC the Amended Charge on or about February 20, 2013; however, she says that she did not investigate the allegations until

April 2013.  Ms. Otten submitted IU Health's position statement to the EEOC in May 2013 (Filing No. 61-1 at 2).  In her affidavit, Ms. Otten says that she did not inform Ms. Daniels, Ms. Riley, and Mr. Bowman about the EEOC Charges that had been filed by Ms. Cantley until April 11, 2013, (Filing No. 55-13 at 6).

On August 15, 2013, Ms. Cantley filed a Complaint in this court against IU Health, alleging that IU Health had violated her rights as protected by Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Civil Rights Act of 1866 as amended, 42 U.S.C. § 1981 ("Section 1981"), and the Age Discrimination in Employment Act of 1967 as amended, 29 U.S.C. § 623 *et seq.* ("ADEA").  She asserted claims for race discrimination under Title VII and Section 1981, retaliation under Title VII and Section 1981, and age discrimination under ADEA.  IU Health filed its Answer and Defenses on October 8, 2013 (Filing No. 18).

The parties conducted discovery, and then on August 20, 2014, Ms. Cantley filed a Stipulation of Dismissal of her age discrimination claim under the ADEA and her race discrimination claims under Title VII and Section 1981 (Filing No. 44). The Stipulation of Dismissal also included dismissal of Ms. Cantley's retaliation claims under Title VII and Section 1981 as to the allegations of a failure to hire or promote.  On August 21, 2014, the Court ordered dismissal of these claims (Filing No. 45).  Ms. Cantley's retaliatory termination claims under Title VII and Section 1981 remain pending following the stipulated dismissal.

## II.  SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d

487, 489–90 (7th Cir. 2007).  In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor."  *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion."  *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted).  Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial."  *Hemsworth*, 476 F.3d at 490 (citation omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim."  *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (internal citations and quotation marks omitted).  "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment."  *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (internal citations and quotation marks omitted).

The Court views the designated evidence in the light most favorable to Ms. Cantley, as the nonmoving party, and draws all reasonable inferences in her favor.  *Bright v. CCA*, 2013 WL 6047505, at *3 (S.D. Ind. Nov. 14, 2013).

## III.  DISCUSSION

IU Health has moved for summary judgment on Ms. Cantley's remaining claim under Title VII and Section 1981 that IU Health terminated her employment in retaliation for her complaint in late 2011 or early 2012 that there was a lack of diversity in leadership and for her EEOC Charge

filed in October 2012. IU Health asserts that summary judgment is appropriate because there is no causal connection between Ms. Cantley's termination and any protected activity in which she engaged.

**A.    Legal Principles Governing Retaliation Claims**

A plaintiff may show retaliation by using either the direct method or the indirect, burden-shifting method. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 662 (7th Cir. 2006). This standard applies to retaliation claims whether they are brought under Title VII or Section 1981. *Smith v. Bray*, 681 F.3d 888, 896 (7th Cir. 2012).

Under the direct method of proof, a plaintiff must show "(1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two." *Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655, 657 (7th Cir. 2012). Furthermore, "[a]n employer must have actual knowledge of the employee's protected activity to state a claim for retaliation." *Id.* at 658; *Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004).

Under the direct method, a plaintiff may proffer direct or circumstantial evidence to prove retaliation. *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 643 (7th Cir. 2013). Direct evidence "would require something akin to an admission from the [employer] that it took action against [the employee] because of his protected activity." *Id.* A plaintiff may also prevail under the direct method by constructing a "convincing mosaic" of circumstantial evidence that "could convince a reasonable jury that he was the victim of unlawful retaliation." *Id.*; *see also Smith*, 681 F.3d at 901.

A convincing mosaic of circumstantial evidence must include evidence from which an inference of retaliatory intent can be drawn, which could include "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence,

statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Hobgood*, 731 F.3d at 643–44. "The ultimate question the parties and the court always must answer is whether it is more likely than not that the plaintiff was subjected to the adverse employment action because of his protected status or activity." *Id.* at 644.

Alternatively, under the indirect method of proof, the plaintiff has the initial burden of establishing a *prima facie* case that the adverse employment action was retaliatory. *Tomanovich*, 457 F.3d at 663. This requires the plaintiff to show "(1) she engaged in a statutorily protected activity; (2) she met the employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005); *Tomanovich*, 457 F.3d at 663. If the plaintiff establishes a *prima facie* case of retaliation, then the burden of production shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse employment action. *Moser*, 406 F.3d at 904; *Tomanovich*, 457 F.3d at 663. If the employer meets this burden, then the burden shifts back to the plaintiff to submit evidence that the employer's stated reason is pretextual. *Id.*

## B.    Ms. Cantley's Retaliation Claim

To demonstrate a case of retaliation, Ms. Cantley must show that she "opposed" prohibited conduct or at minimum, that she had a reasonable belief that she was challenging such conduct. *Gleason v. Mesirow Fin.*, 118 F.3de 1134 (7th Cir. 1997). Ms. Cantley alleges that IU Health retaliated against her when it ended her employment in February 2013 because she had complained about a lack of diversity in leadership at IU Health and because she had filed an EEOC Charge of

Discrimination. It appears that Ms. Cantley is using the direct method of constructing a convincing mosaic of circumstantial evidence of retaliation. However, under either approach, the Court considers the same designated evidence and reviews the same arguments presented by the parties.

### 1.      Ms. Cantley's Protected Activity

Ms. Cantley points to two incidents of protected activity, which she asserts resulted in her termination.  The first occurred in late 2011 or early 2012 when she complained to Ms. Riley, Mr. Bowman, and Ms. Daniels about a lack of diversity in leadership in the heart station.  Ms. Cantley explained to Ms. Riley that the entry level positions in the department were filled predominantly by Black females, giving the implication that IU Health was discriminatory in its hiring practices for leadership positions. Ms. Cantley also asserts that she discussed with Mr. Bowman and Ms. Daniels about the lack of diversity in leadership.

IU Health responds that Mr. Bowman and Ms. Daniels do not recall Ms. Cantley's lack of diversity comment, and IU Health initially disputed that she ever made such a comment to them. However, in its reply brief, IU Health concedes for summary judgment purposes that Ms. Cantley made the lack of diversity comment to Mr. Bowman and Ms. Daniels in addition to making the comment to Ms. Riley.

IU Health disputes Ms. Cantley's assertion that she explained to Ms. Riley that the entry level positions in the department were filled predominantly by Black females.  IU Health asserts that Ms. Cantley never expounded upon her lack of diversity comment to connect "diversity" to any protected class such as race or gender, thus a vague comment regarding a lack of diversity cannot rise to the level of protected activity, relying on *Tomanovich*, 457 F.3d at 663 (complaint of discrimination or lack of diversity without connecting it to a protected class does not constitute

protected activity); *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003) (same); and *Riordan v. J.C. Whitney Co.*, 2004 U.S. Dist. LEXIS 17658, at *9 (N.D. Ill. Aug. 13, 2004) (same).

However, Ms. Cantley insists that she made the connection between her lack of diversity comment and the protected class of race by explaining to Ms. Riley that the entry level positions in the department were filled predominantly by Black females. Ms. Cantley argues that these comments about a lack of diversity in leadership and Black females in entry level positions provided facts sufficient to create an inference of a complaint of race discrimination, thereby making her complaint to Ms. Riley protected activity.

The parties dispute the fact that Ms. Cantley told Ms. Riley that the entry level positions in the heart station were filled predominantly by Black females. However, when reviewing a summary judgment motion, the Court must view the record in the light favorable to the nonmoving party, here Ms. Cantley. Therefore, the Court concludes that Ms. Cantley made the statement to Ms. Riley that the entry level positions in the department were filled predominantly by Black females and that there was a lack of diversity in leadership. Thus, the inference can be made that Ms. Cantley complained to Ms. Riley about discriminatory hiring practices and such complaint was a protected activity.

The second incident of protected activity in which Ms. Cantley engaged occurred on October 22, 2012, when she filed a Charge with the EEOC, complaining that IU Health engaged in race discrimination and also retaliated against her for engaging in protected activity. There is no dispute that filing an EEOC Charge is protected activity. IU Health asserts that Ms. Daniels (the individual who decided to terminate Ms. Cantley's employment), as well as Ms. Riley and Mr. Bowman, did not know about the EEOC Charge until two months after the decision to terminate Ms. Cantley, but prior to the disposition of Ms. Cantley's appeal. Ms. Cantley challenges

14

the plausibility of this assertion and argues that a determination of whether or not those who participated in the decision to terminate Cantley knew of her EEOC Charges, under these circumstances, should be left to the trier of fact. (Filing No. 56 at 19). The Court is persuaded.

### 2.    Causal Connection Between Protected Activity and Termination

The first complaint alone is sufficient to show that Ms. Cantley engaged in protected activity. In order to avoid summary judgment, after showing that she engaged in protected activity, Ms. Cantley also must show that she suffered an adverse employment action resulting from the protected activity.  The parties do not dispute that Ms. Cantley suffered an adverse employment action when she was terminated, but IU Health asserts that there is no causal connection between Ms. Cantley's protected activity and her termination.  IU Health explains that it had legitimate, non-retaliatory reasons to terminate Ms. Cantley's employment.

To show a causal connection between her protected activity and her termination, Ms. Cantley argues that she did not receive any discipline until after she had engaged in protected activity.  IU argues that the designated evidence indicates otherwise and points to the December 21, 2010 written warning and corrective action when Ms. Cantley accidently left her pager at her work station. IU also asserts that Ms. Cantley was given informal counseling by her supervisors on two occasions in October 2010 because of unprofessional conduct and delaying patient care. However, the 2010 warnings were rescinded in early 2011 per Ms. Cantley's agreement with IU Management.

Ms. Cantley's points out that her 2011 employee annual review noted that she was meeting expectations. It was near the end of 2011 or beginning of 2012 that Ms. Cantley first complained to Ms. Riley about a lack of diversity in leadership and a failure to promote Black females. IU asserts that on March 16, 2012, Mr. Dobbs emailed two incident reports to Ms. Riley and Mr.

15

Bowman involving allegation that Ms. Cantley acted unprofessionally with nursing staff in front of patients and delayed patient care on December 29, 2011 and January 14, 2012. Ms. Riley did not conduct an investigation or issue formal discipline about these incidents, instead, she informally counseled Ms. Cantley in March 2012 to act professionally and timely. Ms. Cantley argues that this informal counseling regarding old incidents happened only because she had complained to Ms. Riley and that it occurred "soon after" she complained. The designated evidence indicates that this verbal counseling occurred "soon after" Ms. Cantley complained near the end of 2011 or beginning of 2012.

Next, Ms. Cantley asserts that Mr. Bowman made an ambiguous comment to her that "she appeared unhappy in the department and that maybe she should look for work elsewhere." (Filing No. 56 at 7.) IU asserts that Mr. Bowman first issued formal discipline to Ms. Cantley before he and Ms. Cantley discussed her satisfaction with work and he suggested that she find other employment. But this also is disputed by Ms. Cantley. Mr. Bowman issued a documented counseling corrective action to Ms. Cantley on June 28, 2012, following the investigation of a June 5, 2012 complaint that Ms. Cantley's interacted unprofessionally with nurses and a patient. Then on July 5, 2012, Ms. Cantley approached Mr. Bowman to discuss why she had not received a pay raise. After reviewing documents, Mr. Bowman explained to her why she did not receive a raise, and Ms. Cantley asked who she could talk with. Mr. Bowman told her there was no one else to talk with about pay raises. He then explained that she probably could talk with someone in the human resources department. Ms. Cantley expressed her frustration about the situation and that she felt like the department was holding her back, Mr. Bowman told her that she seemed unhappy in the department and "maybe she should consider looking for other opportunities." (Filing No. 57-5 at 2.)

16

Ms. Cantley argues that this comment was made after Mr. Bowman could not answer Ms. Cantley's question about why she did not receive a pay raise and after he told that she could not speak to anyone else about it. She also asserts that in a short, two-week span Mr. Bowman twice disciplined her immediately following his comment that she was unhappy and should look for work elsewhere. The Court finds that Mr. Bowman's comment is sufficiently ambiguous to raise an inference of retaliation.

Ms. Cantley's next formal discipline came on July 13, 2012. Ms. Cantley called IU Health to explain that she would not be coming to work on June 18, 19, and 20, 2012, which led up to approved scheduled time off on June 21, 22, 23, 24, and 26. Mr. Bowman says that he documented these 15 months old absences in Ms. Cantley's discipline to show a pattern of unscheduled, unexcused absences. However, during their meeting he told Ms. Cantley "while we normally don't look back on things this far back, we did in your case." (Filing No. 55-2 at 61). Ms. Cantley argues suspicious timing in bringing up the 15 month old absences after she complained about the lack of diversity in leadership.

Concerning the July 13, 2012 discipline, Ms. Cantley argues that Mr. Bowman issued this corrective action against her "[a]round [the] same time[] Bowman vented his frustrations to Otten about Cantley [sic] complaints about him." (Filing No. 56 at 8–9.) Ms. Cantley points to a July 17, 2012 email from Mr. Bowman to Ms. Otten in support of this assertion. In his email, Mr. Bowman asked Ms. Otten, as an unbiased participant, to attend a meeting that Ms. Cantley requested with Ms. Daniels concerning Mr. Bowman's poor performance as her manager (Filing No. 57-9 at 2).

Approximately three months later, Ms. Cantley filed a Charge of Discrimination with the EEOC on October 22, 2012. Ms. Otten received the notice of the EEOC Charge in October 2012.

17

Ms. Cantley filed an Amended EEOC Charge in February 2013. Ms. Otten requested and received multiple extensions of time to investigate and respond to the EEOC Charges. IU Health has designated evidence that Ms. Otten did not inform Ms. Riley, Mr. Bowman, or Ms. Daniels of the Amended Charge until April 2013, six months after receiving the EEOC Charge and two months after Ms. Cantley was terminated. Ms. Cantley submits that the designated evidence is "self-serving" and not credible. (Filing No. 56 at 19).  The Court does not judge the credibility of evidence, however, the Court is persuaded that a reasonable jury could conclude, as Ms. Cantley has argued, that it is not plausible that IU Health's Human Resource department would have waited six months to interview those named in an EEOC Charge.

Ms. Otten relied on information given by Ms. Daniels, Ms. Riley and Mr. Bowman and Mr. VanderWier when making the decision to terminate Ms. Cantley. (Filing No. 55-9 at 14-27 and Filing No. 55-12 at 3-6). Ms. Cantley asserts that a reasonable jury could determine there is enough evidence to prove that Daniels retaliated against her when she terminated her employment, even without input from Bowman and Riley, their retaliatory bias can be inputed to Daniels.

As for pretext, it can be shown by demonstrating that (1) the proffered reason is factually baseless, (2) the proffered reason is not the actual motivation for the adverse employment action, or (3) the proffered reason is insufficient to motivate the adverse action. *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996).  Ms. Cantley has offered sufficient evidence that she was terminated, at least in part, based on her complaints that there was a lack of racial diversity in management at IU Health and that IU Health was aware of her complaints.

### 3.    Similarly Situated Employees

The Court also addresses Ms. Cantley's argument that she received less favorable treatment than similarly situated employees who did not engage in protected activity.  Under the indirect

method of proof, a plaintiff must show that she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity.  *Tomanovich*, 457 F.3d at 663.

Ms. Cantley asserts that IU Health's retaliatory motive for firing her is evidenced by the lack of discipline for other cardiovascular technicians who engaged in the same behavior as Ms. Cantley and its failure to issue any discipline to the other cardiovascular technician directly involved in the January 21, 2013 incident that led to Ms. Cantley's termination.  Ms. Cantley claims that it is common practice among the cardiovascular technicians to clear their task list by marking EKG orders as completed by the previous shift.

IU Health responds that the other cardiovascular technicians are not similarly situated employees because their conduct was sufficiently different from Ms. Cantley's conduct to warrant distinction between her and the other technicians, none of which were terminated. IU Health distinguishes Ms. Cantley's conduct from the conduct of the other cardiovascular technicians on the basis that Ms. Cantley failed to take any steps to verify that the EKG orders actually were completed before she marked the orders as "completed" and "assumed done" by the previous shift, which thereby removed the orders from the task list and caused the orders to be delayed—and could have caused the orders not to be completed at all.  IU Health explains that while other cardiovascular technicians cleared the task list by marking EKG orders as completed by the previous shift, they did so after verifying that the orders actually had been completed.

Ms. Cantley challenges that there is a distinction between she and the other cardiovascular technicians. During IU Health's investigation, Mr. Wagoner and Ms. Riley determined that the other cardiovascular technicians did not clear their task list by marking EKG orders as completed by the previous shift without first verifying that the orders actually had been completed.

Regarding IU Health's distinction, Ms. Cantley argues:

> With respect to the January 21 incident, Defendant claims that it could not find one EKG Tech that could verify that others had also cleared a task list believing the previous shift had completed the same, although it conspicuously did not identify with particularity any one person who was asked. Cantley took one deposition in this case, and she was able to obtain verification that nearly every EKG Tech had done the same thing at one time or another.

(Filing No. 56 at 23.) IU Health relies on the statements of two identified cardiovascular technicians who were interviewed by Mr. Wagoner and asserts that Ms. Riley "interviewed every cardiovascular technician in the department." Ms. Cantley relies on deposition testimony from Dawn George, another cardiovascular technician, for her argument that every cardiovascular technician "had done the same thing at one time or another." Because there is a factual dispute on this issue, it should be resolved by the trier of fact.

## IV.  CONCLUSION

In construing the record in plaintiff's favor, as the Court must do, the designated evidence and the factual disputes between the parties preclude entry of summary judgment on Ms. Cantley's retaliation claim. Accordingly, IU Health's Motion for Summary Judgment (Filing No. 53) is **DENIED.**

The parties are further ordered to confer with the Magistrate Judge to reschedule all deadlines. A trial date will be scheduled by separate Entry.

**SO ORDERED.**

Date: 9/28/2015

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Jason P. Cleveland
JOHN H. HASKIN & ASSOCIATES
jcleveland@jhaskinlaw.com

John H. Haskin
JOHN H. HASKIN & ASSOCIATES
jhaskin@jhaskinlaw.com

Bonnie L. Martin
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
bonnie.martin@odnss.com

Dorothy D. Parson
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
dorothy.parson@odnss.com